Robert BEY, Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 3–675A126.

Court of Appeals of Indiana,
Third District.

Jan. 16, 1979.

Dissenting Opinion Feb. 13, 1979.

Dennis R. Kramer, Crown Point, for defendant-appellant.

Theo. L. Sendak, Atty. Gen., John D. Shuman, Asst. Atty. Gen., Bruce M. Frey, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

HOFFMAN, Judge.

Following waiver of jurisdiction by the Lake County Juvenile Court on May 14, 1974, defendant-appellant Robert Bey was charged by information with the offense of assault and battery with intent to kill.[1] A jury trial resulted in a finding of guilty of the lesser included offense of aggravated assault and battery.[2] Judgment was entered thereon by the trial court and appellant was sentenced to the Indiana Department of Correction for a period of not less than one nor more than five years. Following the denial of his belated motion to correct errors, appellant brings this appeal contending that the juvenile court waiver hearing constituted an adjudication such that his subsequent criminal trial subjected him to the risk of double jeopardy, that jurisdiction was not properly waived by juvenile court, and that his criminal trial counsel was incompetent.

Appellant contends that jeopardy attached at the waiver hearing because he could have been adjudicated a delinquent as a result of such hearing. Relying on *Breed v. Jones* (1975), 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346, appellant argues that a hearing to waive jurisdiction to criminal court must precede an adjudicatory hearing.

The basis of appellant's argument arises from remarks made by the trial judge during the course of the proceedings and the testimony of Juvenile Referee Peter Bell adduced at the hearing on the belated motion to correct errors. Regardless of any remarks made by the trial judge, he twice found that jeopardy did not attach in the waiver hearing: the first, when he denied a motion to dismiss based upon double jeopardy; the second, when he denied the belated motion to correct errors after hearing evidence thereon.

If the facts presented to the trial judge demonstrated that jeopardy had attached in the juvenile hearing, he would have followed the law and either granted the motion to dismiss or granted the motion to correct errors.

1. IC 1971, 35–13–2–1 (Burns Code Ed.). The statute was repealed by Acts 1976, P.L. 148, § 24. For current law see IC 1971, 35–41–5–1 (1977 Burns Supp.).

2. IC 1971, 35–13–3–1 (Burns Code Ed.). This statute was repealed by the new Penal Code, effective October 1, 1977. *See* note 1. For current law see IC 1971, 35–42–2–2 (1977 Burns Supp.).

■ Appellant also quotes extensively from the testimony of the referee at the hearing on the belated motion to correct errors. Although there were conflicting statements made by the referee, only the trial court was in the position to observe the witness and listen to his testimony. On appellate review the evidence is not weighed and this Court looks to that evidence which supports the trial court's judgment. *Rosell v. State* (1976), Ind., 352 N.E.2d 750. Such evidence reveals that the waiver hearing was conducted for the purpose of determining whether the juvenile should be transferred to criminal court and treated as an adult, that the purpose was not to find the juvenile to be a delinquent, and that the juvenile court did not make a finding that Bey did, in fact, commit the acts alleged in the petition.[3]

The official record furnished this Court contains the following in regards to the juvenile hearing in this case:

3. The referee testified as follows:
"Q. On the bottom of docket sheet Defendant's Exhibit 1 it says, 'Submitted. Evidence heard. After full preliminary hearing of certain alleged criminal acts committed in Lake County, Indiana on or about April 17, 1974?'
"A. That is correct. That is according to the statute.
"Q. In regard to Mr. Robert Bey did you have a full preliminary hearing in the Juvenile Court in regards to Assault and Battery with intent to Kill?
"A. We had a hearing to determine whether to waive Robert Bey to the Superior Court, Criminal Division.
    *    *    *    *    *    *
"Q. Now, on 5-14-74 what was your procedure. I don't know if you recall the different facts in Bey, what was your procedure in regard to waiver hearing?
"A. In a waiver hearing we hear all the evidence and then determine whether a youngster must be waived or not from the evidence wherein based on the facts that were presented there on that court sheet. We do not find a youngster a delinquent but we waive them on request of prosecutor's request after hearing the evidence presented to us.
"Q. And the prosecutor presents evidence as if it were a criminal case?
"A. It is not a criminal case.
    *    *    *    *    *    *
"Q. As if it were a criminal case?
"A. It is presented in a normal juvenile manner.

"BE IT REMEMBERED that on the 14th day of May, 1974, the above-entitled cause came on for hearing in said Court and before the Honorable Peter Bell, duly-appointed Referee of the Juvenile Division, Lake Superior Court of Lake County, Indiana, on said date; the said cause was submitted to the Court for waiver hearing; and that the oral evidence, objections, and rulings of the Court on the introduction of evidence in said cause were taken down in stenotypy by Mary Halkias, Official Court Reporter of the Juvenile Division of the Lake Superior Court of Lake County, Indiana." The finding of the juvenile referee as well as the order of the juvenile court waiving jurisdiction state, "[a]fter full preliminary hearing . . . ." A consideration of all these factors demonstrates that the juvenile hearing conducted was a preliminary hearing to determine the question of waiver and as such was not an adjudicatory hearing.

"Q. What is the purpose for the prosecutor presenting witnesses to the court?
"A. In order to determine whether this youngster should have been waived or not in this particular case.
    *    *    *    *    *    *
"Q. I am not finished with my question Mr. Bell. Was evidence taken by witnesses who were subjected to cross examination intending to prove that the respondent or the defendant regardless of what you want to call him committed what amounted to a criminal offense had he been an adult?
"A. That is correct sir.
"Q. Now, did you have to make a finding as a judicial officer at the conclusion of that hearing that he in fact did commit the acts alleged in the petition or the instrument no matter what you want to call him?
"A. We took that into consideration, we didn't find—
"Q. Answer this question, did you as a judicial officer make a finding that Robert Bey did in fact do those things alleged in the instrument instituting the proceedings?
"A. We did not make a finding to that correct.
"Q. You did not?
"A. No, sir.
"Q. Well, can you then find that there was probable cause that he was the one?
"A. Oh, yes we did, yes.
"Q. You did?
"A. Yes"

Moreover, the juvenile court could not, under the law in existence at the time of the proceedings, have adjudicated Bey a delinquent as a result of the waiver hearing.

Bey was waived to criminal court under the provisions of IC 1971, 31–5–7–14 (Burns Code Ed.) which, in 1974,[4] provided in part as follows:

"If a child fifteen [15] years of age or older is charged with an offense which would amount to a crime if committed by an adult, the judge, *after full investigation,* may waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult; or such court may exercise the powers conferred upon the juvenile court in this act [31–5–7–1—31–5–7–25] in conducting and disposing of such case: . . . ." (Emphasis supplied.)

The requirement of a "full investigation" has been interpreted to mean that a juvenile must be given a full hearing prior to waiver, and the court must find:

1. The offense has specific prosecutive merit in the opinion of the prosecuting attorney; or

2. It is heinous or of an aggravated character, greater weight being given to offenses against the person than to offenses against property; or

3. The offense is part of a repetitive pattern of juvenile offenses; or

4. It is in the best interests of the public security that said juvenile be required to stand trial as an adult offender.

*Summers v. State* (1967), 248 Ind. 551, 230 N.E.2d 320; *See also: Atkins et al. v. State* (1972), 259 Ind. 596, 290 N.E.2d 441; *Duvall v. State* (1976), Ind.App., 353 N.E.2d 478; *Imel v. State* (1976), Ind.App., 342 N.E.2d 897; *Clemons v. State* (1974), 162 Ind.App. 50, 317 N.E.2d 859, *cert. den.* 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86.

Bey was provided such a hearing, and it resulted in findings that the offense was of a serious nature, that there were no reasonable prospects for rehabilitating Bey by use of the facilities currently available to the juvenile court, and that there were no prospects for adequately protecting the public by use of such juvenile facilities.

Our Supreme Court responded to a double jeopardy challenge in *Walker v. State* (1976), Ind., 349 N.E.2d 161, at 166, *cert. den.,* 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 313, by stating that the investigation required under our waiver statute was not an adjudication of delinquency as contemplated by *Breed v. Jones, supra,* but was merely determinative of the forum, and that there is no finding that certain acts have or have not been committed in fact. *See also: Seay v. State* (1976), Ind.App., 340 N.E.2d 369 (on rehearing).

As pointed out in *Murphy v. State* (1977), Ind.App., 364 N.E.2d 770, when a waiver petition is filed a hearing must be held on that issue. Therefore there was no possibility that Bey could have been adjudged a delinquent at this hearing, so no jeopardy attached. "A further hearing is required before a determination of delinquency is possible." *Murphy v. State, supra.*

Consequently, regardless of what the juvenile referee thought he could or could not do as a result of the juvenile waiver hearing, the law required a further hearing before an adjudication of delinquency could be made. Any other result would be beyond his power and void. Moreover, the course of action actually followed by the juvenile court as demonstrated by the record resulted in a properly conducted waiver hearing.

██ Appellant next contends that jurisdiction was not properly waived by juvenile court because the waiver order was not set out with the required specificity and because the juvenile court was only concerned with the serious nature of the offense.

---

4. This provision has since been amended on three different occasions. Acts 1975, P.L. 296, § 6; Acts 1976, P.L. 129, § 7; Acts 1978, P.L. 2, § 3112. Under the current statute, waiver of juvenile jurisdiction is presumptively valid un- der situations where the child is charged with an act which would amount to forcible felony if committed by an adult unless the court makes specific findings which justify retention of jurisdiction.

The juvenile court found that appellant was born on February 20, 1958, and was under 18 years of age at the time of the alleged act, that the offense was serious in nature, that there were no reasonable prospects for rehabilitating the juvenile by use of currently available juvenile facilities, and that there was no adequate way of protecting the public by use of the current juvenile facilities.

■ In *Summers v. State, supra*, our Supreme Court held that a waiver order must contain a statement of the reasons supporting a waiver, and that although the statement need not include a conventional finding of facts, it should nevertheless be sufficient to demonstrate unequivocally that the strict statutory requirement of a full investigation and hearing have been met and that a conscientious determination of the question of waiver has been made. However, the record of the waiver hearing may be used to supplement the reasons for waiver as stated by the juvenile judge. *Redding v. State* (1977), Ind.App., 370 N.E.2d 397; *Seay v. State* (1975), Ind.App., 337 N.E.2d 489; *Clemons v. State, supra*. The record reveals allegations that on April 17, 1974, several black youths approached the truck of Mr. and Mrs. Casmir Smolinski as it was stopped for a traffic light at 21st Street and Martin Luther King Drive in Gary, Indiana. Mrs. Smolinski saw someone holding a rifle, heard her daughter scream, and attempted to pull her daughter down in the seat. As her husband was trying to drive away, Mrs. Smolinski was struck in the eyes by two bullets. She was confined in the hospital for twelve days and lost the sight of her left eye. Two youths who were present at the time of the incident identified Robert Bey as the person who fired the rifle. Additionally, it was disclosed that Bey was previously involved with the juvenile court for shoplifting and put on withheld commitment to the Indiana Boy's School. Subsequently, he was committed to the Boy's School for glue sniffing.

The juvenile court could conclude from the evidence produced that the range of dispositions available within the juvenile justice system were inadequate in this particular case to serve "the child's welfare and the best interests of the state." *See: Atkins et al. v. State* (1972), *supra*, 259 Ind. 596, 290 N.E.2d 441.

■ Appellant also contends that the trial court's failure to grant a continuance until a transcript of the juvenile proceedings could be obtained denied the appellant the opportunity to adequately prepare his defense. The evidence reveals that on October 24, 1974, the court was informed of a plea bargaining session between the parties. Both parties agreed to a continuance, and it was granted by the trial court. Appellant was also granted his request for an order to obtain the transcript of the waiver hearing in juvenile court. On December 12, 1974, appellant requested a further continuance to obtain information concerning his juvenile court hearing. Such request was denied by the trial court because the stated reason was deemed insufficient. However, the court, on its own motion, by reason of a congested court docket, continued the matter to February 3, 1975. On January 28, 1975, appellant requested another continuance, stating that pauper attorney needed additional time to prepare a defense and that appellant had failed to confer with counsel for the past two months despite counsel's requests. This motion was denied. On February 3, 1975, appellant failed to appear for trial and a bench warrant was issued. On February 4, 1975, appellant appeared in court and filed several motions, including an oral motion for a continuance. The motion for continuance was denied because no new grounds were alleged therefor. At the hearing on the motions, appellant's counsel stated that the juvenile court indicated that it would provide appellant with part of the record and that counsel did nothing further to obtain the entire transcript. Counsel further stated that he did not know the transcript would be needed until his discussion with his client earlier that morning. Counsel further stated that he was informed later that morning that the transcript was unavailable.

Appellant's contention in this regard is that he was entitled to a continuance because of the State's blatant disregard of the court's pretrial discovery order. *See: Dorsey v. State* (1970), 254 Ind. 409, 260 N.E.2d 800. However, appellant was apparently satisfied with that portion of the record provided by the juvenile court until the morning of trial. Under the state of facts as disclosed by the record, it cannot be said that the State disregarded any discovery order. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for discovery.

■ Appellant's final contention is that he was represented by incompetent counsel in the criminal trial. The basis of this argument is an asserted minimal amount of contact between the attorney and client and the failure to interview appellant's brother regarding matters of defense. Appellant's citations to the transcript in support of his minimal contact argument are to statements made during the hearing on appellant's pretrial motions. Assuming that such statements reveal minimal contact between attorney and client, they also disclose the lack of communication was the result of appellant's failure to cooperate with his attorney. Appellant has failed to demonstrate that trial counsel was incompetent.

Accordingly, the judgment of the trial court must be affirmed.

Affirmed.

ROBERTSON, J., participating by designation, concurs.

STATON, J., dissents with opinion to follow.

STATON, Judge, dissenting.

I dissent. The unique Lake County juvenile procedure which fuses a dispositional waiver hearing with an adjudicatory hearing to determine delinquency violates the constitutional guarantee against double jeopardy. Bey was required to defend his liberty at this Lake County juvenile proceeding or be adjudged a delinquent. Later, Bey was required to defend his liberty again for the same act in the Lake Criminal Court where he finally lost his liberty. The majority opinion chooses to ignore this unconstitutional fusion of dispositional and adjudicatory proceedings. Its litmus test for constitutionality is incorrect, since it looks only to what the Lake County Juvenile Court could have done under the law and to what the Lake County Juvenile Court did at the conclusion of the proceeding. Instead, it should have looked at what the Lake County Juvenile Court actually did by holding a fused proceeding and what this fused hearing required Bey to do if he was to retain his liberty. If Bey's liberty was in jeopardy during the first proceeding in juvenile court where he could have been adjudged a delinquent, then, a second proceeding in an adult criminal court where he was adjudged guilty of an adult crime, would constitute double jeopardy. Constitutional guarantees such as double jeopardy must be held sacred. Hard facts are the litmus tests for constitutional principles. I think that the litmus test is red in Bey's case. It shows that this fused Lake County juvenile proceeding will erode the sacred constitutional principle of double jeopardy; therefore, I dissent.

The State concedes that the juvenile referee held a fused proceeding, and it assumes the same test adopted by the majority opinion. In the State's Brief at page eight, it states:

"To be sure, the referee who conducted the hearing entertained the erroneous opinion that he had authority to determine the issue of waiver at an 'adjudicatory' hearing, and thought that that was what he was doing. But the State submits that the referee's opinions as to the state of the proceedings and the alternatives open to him, although certainly relevant, are not determinative. The issue is not what the referee thought his alternitives [*sic*] were. Rather, the issue is the validity of what he actually did. Under the law, he could not waive at an 'adjudicatory' hearing, nor could he adjudicate at a 'waiver' hearing and the instant hearing was either one or the other."

The "erroneous opinion" referred to by the State in its brief is gleaned in part from the cross-examination of the juvenile referee. After explaining the separate trial procedure for adjudicating delinquency and the separate waiver hearing procedure, the referee gave these answers on cross-examination as to how the hearing is actually conducted:

"Q. Do you then conduct a delinquency hearing?

"A. That is correct sir.

"Q. You then—in other words it's a separate hearing to determine delinquency?

"A. No, same hearing whereby after hearing all the evidence we determine to what you call deny the waiver petition, we retain jurisdiction and then proceed with the case from that end.

"Q. What do you do after that?

"A. We find the youngster or minor to be delinquent and then either commit him to boy's school depending upon the type of crime or repetitive action that the minor has done and depend on type of crime he has performed and not crime but delinquency action."

Judge Letsinger then questioned the referee as follows:

"Q. Was evidence taken by witnesses who were subjected to cross examination intending to prove that the respondent or the defendant regardless of what you want to call him committed what amounted to a criminal offense had he been an adult?

"A. That is correct sir.

"Q. Now, did you have to make a finding as a judicial officer at the conclusion of that hearing that he in fact did commit the acts alleged in the petition or the instrument no matter what you want call him?

"A. We took that into consideration, we didn't find—

"Q. Answer this question, did you as a judicial officer make a finding that Robert Bey did in fact do those things alleged in the instrument instituting the proceedings?

"A. We did not make a finding to that correct.

"Q. You did not?

"A. No, sir.

"Q. Well, can you then find that there was probable cause that he was the one?

"A. Oh, yes we did, yes.

"Q. You did?

"A. Yes.

"Q. So your [sic] saying then that all you confined yourself to finding on that today—day was that he probably was the one who did it?

"A. No. Not probably but facts turned out that he—or from the information from the evidence we found enough facts to waive him to the criminal court.

"Q. What facts did you find?

"A. Well, as a matter of fact your honor *we found facts that he was the one that from the evidence that he was the one that committed the crime of shooting in this case.* [Emphasis added.]

"Q. Now, had you chosen to do so, you could have sent him to Boy's School as a result of that finding could you not?

"A. Not for that type of serious crime sir. This woman lost her eye if I am not mistaken.

"Q. Are you saying that only the serious nature of offense is what kept you from sending Robert Bey to Boy's School?

"A. That is one of the reasons sir."

and later:

"Q. You could have found him delinquent if you had not found all the serious nature offenses?

"A. That is right."

After the close of questioning, Judge Letsinger commented on the situation as he saw it:

"Well, you can see what is happening. A man is put to trial in a Juvenile Court

and he must present his defense otherwise he may be held to be a delinquent and his liberty is deprived. If he does not put on his defense and bring on witnesses who would prove that he was not the one who did it, he could very well lose his liberty for years."

He further commented:

"Now, there are certain preliminary proceedings which do not—which have no jeopardy attached. That is a preliminary hearing as to define whether there was probable cause that this was the man that probably was the man that committed the act. Now, in those cases the defendant may put on a defense and varify [sic] probable cause hearing. He may put on a defense although he is not required to because as a result of it he will not be deprived of his liberty. That could be done only after trial. That is not the way we are running juvenile waiver hearings in Lake County."

Although Judge Letsinger denied the belated motion to correct errors, he did so with less than absolute certainty. He remarked:

"I am charged here with making a case by case determinations. [sic] Not announcing broad sweeping legal generalities. I think Indiana certainly needs a statement in such situations. I am therefore going to hold that jeopardy did not attach to whatever proceedings [sic] it might have been called in Juvenile Court with little confidence that it will be sustained on appeal."

The waiver statute, IC 1971, 31–5–7–14, (Burns Code Ed., Supp.1978) § 9–3214, does not explicitly provide for separate hearing before an adjudication proceeding on delinquency. Guidelines for a separate hearing are set forth in *Summers v. State* (1967), 248 Ind. 551, 230 N.E.2d 320. *See also Kent v. United States* (1966), 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84.

"He should have the right to counsel at such hearing; the right to confrontation of the witnesses against him; and the right to present evidence, if any be available to him, of any circumstances that would entitle him to the benefits that might be afforded to him by the provisions of the Juvenile Act. And it is only after such a hearing that a waiver and order of transfer to the Lake Criminal Court may be lawfully made."

*Summers v. State, supra,* 230 N.E.2d at 325. The waiver hearing must be held and concluded before a separate adjudicatory trial on delinquency. *Breed v. Jones* (1975), 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346.

*Seay v. State* (1976), Ind.App., 340 N.E.2d 369 does not support the majority's rationale that even though the proceedings are understood to be adjudicatory by the juvenile and the referee, jeopardy does not attach if the referee who is also considering waiver at the same time decides to waive the juvenile. In *Seay,* the question was much more narrow than the majority opinion proposes. The pre-petition to find a juvenile delinquent and the subsequent "full investigation" were held to be separate and non-adjudicatory. The pre-petition or request to find a juvenile delinquent is jurisdictional and necessary to initiate the "full investigation." Furthermore, "Seay faced no such burden [of double jeopardy] inasmuch as waiver from juvenile court was sought and granted *prior* to any findings in juvenile court on the merits of the delinquency petitions. In terms of *Breed,* there was no 'adjudicatory' proceeding prior to waiver which would have presented the issue of double jeopardy once trial was begun in adult court." *Seay v. State, supra,* 340 N.E.2d at 370.

In Bey's case, the adjudicatory proceeding to determine delinquency or waiver to an adult court are held at the same time. This is double jeopardy where a second adjudicatory trial is held in an adult court. *Seay* qualified the extent of its holding by stating: "Clearly, Seay was not subjected to a hearing in juvenile court to determine whether he had in fact committed certain alleged acts. The finding that certain acts would be crimes if committed by an adult should not be confused with a finding that such acts were actually committed by the accused." *Seay v. State, supra,* 340 N.E.2d at 370. If the juvenile referee had not decided to waive Bey, he could have found him a delinquent and sent him to Boy's

School. These alternatives, delinquency and Boy's School or waiver and trial in an adult court, are held at the same time and in the same proceeding. When the referee decided to waive Bey to an adult court, Bey was placed in double jeopardy in the adult court, since he had the burden for a second time of defending his liberty.

I strongly disapprove of the Lake County Juvenile proceedings held in the Bey case which fuses a dispositional waiver hearing with an adjudicatory delinquency trial.

This fused proceeding violates not only Bey's constitutional guarantee against double jeopardy, but every other juvenile's constitutional guarantee against double jeopardy who is subjected to the same fused proceeding. I would reverse the trial court's judgment.[1]

1. Bey's fused proceeding took place approximately a year before *Breed v. Jones, supra,* was decided by the United States Supreme Court. Therefore, any dissent would not be complete without some discussion devoted to retroactive application of *Breed.*

The State relies on *Linkletter v. Walker* (1965), 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 to bolster its argument against the retroactive application of *Breed. Linkletter* differs from *Breed* in two important ways: (1) the *Linkletter* court did not view the exclusionary rule as explicitly derived from the Fourth Amendment; and (2) the Court had implicitly approved the continuing rejection of the exclusionary rule in state cases through its refusal to reconsider its own earlier rejection of the exclusionary rule in state cases. (*See also,* Berry v. State (1974), 162 Ind.App. 626, 321 N.E.2d 207 for retroactive application of procedural rules.)

In 1973, *Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 concluded that double jeopardy cases were "not readily susceptible of analysis under the *Linkletter* line of cases." 409 U.S. at 508, 93 S.Ct. at 878. *Robinson* placed limits on the *Linkletter* line of analysis, noting that prior to the *Linkletter* decision, "[T]here would have been less doubt concerning the retroactivity of the *Waller* holding." [Referring to *Waller v. Florida* (1970), 398 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435, 409 U.S. at 507, 93 S.Ct. at 877.] The *Robinson* Court concluded:

"The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial. A number of the constitutional rules applied prospectively only under the *Linkletter* cases were found not to affect the basic fairness of the earlier trial, but to have been directed instead to collateral purposes such as the deterrence of unlawful police conduct, *Mapp v. Ohio, supra* [367 U.S. 643, 81 S.Ct. 1684, 6

L.Ed.2d 1081]. In *Waller,* however, the Court's ruling was squarely directed to the prevention of the second trial's taking place at all, even though it might have been conducted with a scrupulous regard for all of the constitutional procedural rights of the defendant.

"We would not suggest that the distinction that we draw is an ironclad one that will invariably result in the easy classification of cases in one category or the other. The element of reliance embodied in the *Linkletter* analysis will not be wholly absent in the case of constitutional decisions not related to trial procedure . . . ."
409 U.S. at 509, 93 S.Ct. at 878. *See also, Blackledge v. Perry* (1974), 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628.

In *Holt v. Black,* 550 F.2d 1061 (6th Cir. 1977), *cert. denied* 432 U.S. 910, 97 S.Ct. 2960, 53 L.Ed.2d 1084, the Circuit Court of Appeals held *Breed* retroactive. The court rejected the *Linkletter* line of analysis urged by the state, and instead relied on *Robinson* as more relevant, and considered its language to be dispositive of the appeal, requiring reversal. The *Holt* Court noted that it would have reached the same result even if *Linkletter* were used in its determination, since

"[T]he fundamental changes in constitutional law which require reversal of this case occurred well before appellant's trial in 1973. In *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), and *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court decisively rejected any Constitutional distinction between the 'civil' law nature of Juvenile Court proceedings and the 'criminal' law nature of courts of general adult jurisdiction. When in 1969 the Supreme Court held for the first time that the double jeopardy clause was applicable to the states through the Fourteenth Amendment, the constitutional ban upon two prosecutions—one in a juvenile court adjudication and the other (after waiver) in the adult criminal court—was complete. Since *Benton* [*Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707]

and before *Breed* a number of states have held that the double jeopardy clause of the United States Constitution applied to juveniles." [Citations omitted.]

550 F.2d at 1064. After considering the body of case law, the court stated:

"[I]n 1973 when appellant was tried twice for the same offense in the state courts of Kentucky, there was then no basis for reliance upon any United States Supreme Court opinion which could be read as allowing that practice in the face of the double jeopardy clause."

550 F.2d at 1065.

The Supreme Court of California likewise held *Breed* retroactive, in *In re Bryan* (1976), 16 Cal.3d 782, 129 Cal.Rptr. 293, 548 P.2d 693. The Supreme Court of California followed the *Robinson* analysis. It briefly referred to *Linkletter,* noting that *Robinson* approved considering as not wholly absent the reliance element of the *Linkletter* test. There was no significant reliance on the concept of continuing jeopardy, noting:

"To the contrary, ever increasing constitutional protections have been granted juveniles."

129 Cal.Rptr. at 296, 548 P.2d at 696. The Supreme Court of California concluded:

"that the general rule of retroactivity is applicable without a *Linkletter* or similar test in the case of a decision compelled by constitutional prohibitions against multiple jeopardy [such as *Breed*]."

*Id.* And further noted that

"Nothing in *Breed* precludes a further disposition by the juvenile court in a suitable case."

129 Cal.Rptr. at 297, 548 P.2d at 697.

The constitutional rights guaranteed to adult criminal defendants have been applicable to juveniles for a decade. I can not conclude that *Breed* was an abrupt departure with serious consequences. Furthermore, the clear language of the Fifth Amendment makes the retroactive application of *Breed* mandatory.